**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BECKY LYNN ROGGENKAMP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 13-572 |
| v. | ) | |
| | ) | Judge Nora Barry Fischer |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.    INTRODUCTION

Becky Lynn Roggenkamp ("Plaintiff") brings this action under 42 U.S.C. § 405(g) seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–433, 1381–1383(f) ("Act"). This matter comes before the Court on cross motions for summary judgment. (Docket Nos. [9], [11]). For the following reasons, the Court finds that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence. Accordingly, Defendant's Motion for Summary Judgment, (Docket No. [11]), is GRANTED, and Plaintiff's Motion for Summary Judgment, (Docket No. [9]), is DENIED.

### II.    PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on December 4, 2009, alleging a disability onset of May 31, 2009 when she stopped working because of her physical and mental conditions. (R. at

161, 167).[1] She claimed that mental disabilities including bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), and anxiety disorder limited her ability to work full time, and also complained of back, knee, and hip pain from multiple surgeries and two automobile accidents. (R. at 166). After both of her claims were denied on April 2, 2010, (R. at 80, 85), Plaintiff appealed her claim on May 2, 2010 and requested a hearing in front of an ALJ. (R. at 16, 194, 207). At the June 14, 2011 hearing, Plaintiff was represented by Barbara Manna, a non-attorney representative, and vocational expert Karen S. Krull testified. (R. at 33–35). In a decision dated September 21, 2011, ALJ John Kooser found although that Plaintiff had severe mental and physical impairments, she was not disabled under the Act, and thus denied Plaintiff's appeal. (R. at 16, 18). Plaintiff requested a Review of Hearing Decision before the SSA Appeals Council, (R. at 10–11), but this request was also denied. (R. at 1–4). Thus, the ALJ's decision is the final decision of the Commissioner. (*Id.*).

Plaintiff then filed a Complaint with this Court, (Docket No. [3]), followed by a Motion for Summary Judgment and Supporting Brief on July 26, 2013. (Docket Nos. [9], [10]). Three weeks later, the Commissioner timely answered with a Cross-Motion for Summary Judgment and Brief. (Docket Nos. [11], [12]). Accordingly, the matter has been fully briefed, and is ready for disposition.

III. **STATEMENT OF FACTS**

A. **General Background**

Plaintiff was born on July 17, 1960 and was 48 years old on her alleged disability onset date. (R. at 161). At the time of her initial application, she listed her mailing address as an

---

[1]     Citations to Docket Nos. 7 – 7-23, the Record, *hereinafter*, "R. at __."

apartment in Ambridge, Pennsylvania. (R. at 165). However, at the ALJ hearing she testified that she was now homeless, and had been since December 2010. (R. at 41). Plaintiff said that she had been living temporarily in a dormitory at La Roche College, through a local charity, for about ten days, and would stay in this program for about one month. (*Id.*). Prior to living at La Roche, she stayed with friends. (*Id.*).

Plaintiff completed vocational training as a medical office assistant in 1985, and obtained about four years' worth of college credit as of 1992, for which she did not receive a degree. (R. at 167). Plaintiff spent 10 years working as a cashier and assistant manager for Wal-Mart, and then between September 2007 and February 2009 she worked as a clerk at a convenience store, a produce worker at a supermarket, a warehouse worker in a distribution center, and a generalized aide in setting up store displays. (R. at 42–43, 177). Plaintiff claims she stopped working in May of 2009 because of the combination of her physical and mental conditions, with the anxiety disorder symptoms being the most disabling. (R. at 44, 64, 167). She now receives public assistance. (R. at 41).

Plaintiff has never been married and has no children, although she reported she recently broke up with her life partner, with whom she used to live. (R. at 40, 209). Through her testimony and witness reports,[2] it appears that Plaintiff enjoys visiting with and sharing meals with friends, as well as playing cards or going to the movies. (R. at 59–60, 217). She is an active member and attends weekly meetings of the Society for Creative Anachronism[3] ("Society"),

---

[2]    The witness reports are discussed *infra*, at 19.
[3]    The Society for Creative Anachronism is an international organization dedicated to researching and recreating the arts and skills of pre-17th-century Europe. The society's "Known World" consists of 19 kingdoms, with over 30,000 members from countries around the world. Members, dressed in clothing of the Middle Ages and Renaissance, attend events such as tournaments, royal courts, feasts, dancing, and various classes and workshops. *SCA*, SOCIETY FOR CREATIVE ANACHRONISM, INC., *available at* www.sca.org (last visited August 20, 2013).

although she testified that she cannot participate in physical activity like she used to do. (R. at 60, 62). Depending on how much money she has, she goes to Society meetings and events as much as she can, usually about twice a week, and goes on occasional weekend trips with her friends. (R. at 62). Plaintiff has a driver's license but could not drive at the time of her hearing because of recent surgery. (R. at 41–42).

### B. Medical History

At the time of her Administrative Hearing, Plaintiff claimed numerous physical and mental conditions prohibited her from working full time. (R. at 44–45, 166, 214–16). Her alleged physical disabilities consist of two herniated discs[4] and degenerative disc disease[5] of the cervical spine[6], chronic pain of her left hip due to trochanteric bursitis,[7] chronic knee pain, asthma,[8] restless leg syndrome,[9] and sleep apnea.[10] (R. at 166, 372, 438, 618). Her back, knee, and hip

---

[4]     A herniated disc "refers to a problem with one of the rubbery cushions (disks) between the individual bones (vertebrae) that stack up to make your spine. . . . A herniated disk can irritate nearby nerves and result in pain, numbness or weakness in an arm or leg. On the other hand, many people experience no symptoms." *Herniated Disk*, MAYO CLINIC, *available at* http://www.mayoclinic.com/health/herniated-disk/DS00893 (last visited Oct. 8, 2013).

[5]     "Degenerative disc disease is a common problem of the aging spine that can lead to severe and intractable low back and neck pain." *Degenerative Disc Disease*, JOHNS HOPKINS MEDICINE, *available at* http://www.hopkinsmedicine.org/neurology_neurosurgery/specialty_areas/spine/conditions/degenerative_disc_disease.html (last visited Oct. 8, 2013).

[6]     The spine consists of regions—the cervical, the thoracic, lumbar, and sacral. The cervical spine is the region of the spine located in the neck, and consists of seven vertebrae, which are abbreviated C1 through C7 (top to bottom). *Understanding Spinal Anatomy: Regions of the Spine - Cervical, Thoracic, Lumbar, Sacral*, COLORADO COMPREHENSIVE SPINE INSTITUTE, *available at* http://www.coloradospineinstitute.com/ subject.php?pn=anatomy-spinalregions14 (last visited Oct. 11, 2013).

[7]     Bursitis is a condition in which "the bursa, a closed fluid-filled sac that functions as a gliding surface to reduce friction between tissues of the body, becomes inflamed." The trochanteric bursa—one of the two major bursae of the hip—is "located on the side of the hip and separated significantly from the actual hip joint by tissue and bone." This condition "can be associated with stiffness and pain around the hip joint." *Hip Problems*, JOHNS HOPKINS MEDICINE, http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/spine_shoulder_and_pelvis _disorders/hip_problems_85,P01371/ (last visited Oct. 8, 2013).

[8]     "Asthma is a chronic, inflammatory lung disease involving recurrent breathing problems. The characteristics of asthma are three airway problems: obstruction; inflammation; hyperresponsiveness." *Asthma Overview*, JOHNS HOPKINS MEDICINE, *available at* http://www.hopkinsmedicine.org/healthlibrary/ conditions/adult/allergy_and_asthma/asthma_overview_85,P09505/ (last visited Oct. 8, 2013).

[9]     Restless legs syndrome "is a disorder of the part of the nervous system that affects the legs and causes an urge to move them. Because it usually interferes with sleep, it also is considered a sleep disorder." *Restless Leg*

pain stem from a June 4, 2009 motor vehicle accident, an injury from a fall in 2007, and a subsequent spinal stenosis[11] surgery on April 11, 2011. (R. at 233–34, 250–52, 454, 466–70). She has undergone additional physical therapy for her knee pain in both knees, as she alleges that osteoarthritis[12] causes her pain as well. (R. at 47, 630–33). Plaintiff has been treated for asthma and testified she uses an inhaler to manage her symptoms. (R. at 52–53, 640, 645). Although not alleged as disabling conditions, her extensive medical record also includes evidence detailing a gallbladder removal, ovarian cysts,[13] type II diabetes,[14] hypothyroidism,[15] and hypertension.[16] (R. at 341, 343, 367–71, 384–86, 389, 435, 565, 531–45).

---

*Syndrome Center*, WEBMD, *available at* http://www.webmd.com/brain/restless-legs-syndrome/restless-legs-syndrome-rls (last visited Oct. 11, 2013).

[10] Apnea is the "absence of breathing," and sleep apnea occurs "during sleep, associated with frequent awakening and often with daytime sleepiness." STEDMAN'S MEDICAL DICTIONARY 118–19 (28th ed. 2006).

[11] Spinal stenosis is the narrowing of the spinal canal that can be present at birth (congenital), acquired/degenerative, or a combination of both. If the stenosis is significant, it may result in neck, back and arm or leg pain. These symptoms may worsen during physical activity. In severe circumstances, dysfunction of the spinal cord or nerve roots may result. *Spinal Stenosis*, JOHNS HOPKINS MEDICINE, *available at* http://www .hopkinsmedicine.org/neurology_neurosurgery/specialty_areas/spine/conditions/spinal_stenosis.html (last visited Oct. 11, 2013).

[12] Osteoarthritis is arthritis characterized by erosion of joint cartilage, which becomes soft, frayed, and thinned, and sometimes outgrowths of small bones occur. It can be caused either primary or secondary to trauma or injury, and results in pain and loss of function in the joint. Osteoarthritis is most common in older people, and in weight bearing joints. STEDMAN'S MEDICAL DICTIONARY 1388 (28th ed. 2006).

[13] Ovarian cysts are fluid-filled sacs that form in or on the ovaries, and can cause pain in the pelvic area. They are treated through "watchful waiting," or surgery. *Ovarian Cysts Fact Sheet*, OFFICE ON WOMEN'S HEALTH, U.S. DEP'T OF HEALTH AND HUMAN SERVICES, *available at* http://www.womenshealth.gov/publications/our-publications/fact-sheet/ovarian-cysts.cfm#g (last visited Oct. 11, 2013).

[14] Type II diabetes, once known as adult-onset or noninsulin-dependent diabetes, "is a chronic condition that affects the way your body metabolizes sugar," or glucose. If left untreated, type II diabetes can be life-threatening. *Type 2 Diabetes*, MAYO CLINIC, *available at* http://www.mayoclinic.com/health/type-2-diabetes/DS00585 (last visited Oct. 11, 2013).

[15] Hypothyroidism is the "diminished production of thyroid hormone, leading to clinical manifestations of thyroid insufficiency, including low metabolic rate," weight gain and a tendency to sleep. STEDMAN'S MEDICAL DICTIONARY 939 (28th ed. 2006).

[16] Hypertension is high blood pressure at a "level likely to induce cardiovascular damage or other adverse consequences." STEDMAN'S MEDICAL DICTIONARY 927 (28th ed. 2006).

Regarding her mental health, Plaintiff stressed that her mental conditions are what is most debilitating. (R. at 64–65). She has been diagnosed with bipolar disorder,[17] ADHD,[18] and anxiety disorder.[19] (R. at 264–65). Plaintiff has received mental health treatment for quite some time, as she alleges she was diagnosed with bipolar disorder in 1991. (R. at 257, 311). She has been most recently treated by Dr. Apolonio Sinu, M.D. from August 2006 to November 2009, and Callie J. Cooper, LSW, from December 2009 to May 2011. (R. at 275–94, 395–403).

In her initial report to the SSA and during her testimony, Plaintiff claimed that she left work because of the stress caused by her anxiety disorder. (R. at 43, 167). Phyllis Brentzel, Psy.D., performed a mental Residual Functioning Capacity ("RFC") assessment on February 12, 2010 for the SSA. (R. at 257, 301, 309, 509). Dr. Brentzel opined that Plaintiff is limited in her "ability to understand and remember complex or detailed instructions." (R. at 311). In spite of this, she determined that Plaintiff was "able to meet the basic mental demands of competitive work on a sustained basis." (*Id*.).

---

[17]     Bipolar disorder, "also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks." The symptoms of the disorder are severe; different "from the normal ups and downs that everyone goes through from time to time." These symptoms "can result in damaged relationships, poor job or school performance, and even suicide." With treatment, people suffering from bipolar disorder can lead normal lives. *Bipolar Disorder*, NAT'L INST. OF MENTAL HEALTH, *available at* http://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml (last visited Oct. 11, 2013).

[18]     Adult attention-deficit/hyperactivity disorder (ADHD) is a mental health condition, symptoms of which include difficulty maintaining attention, hyperactivity, and impulsive behavior. Adult ADHD symptoms can lead to a number of problems, including unstable relationships, poor work or school performance, and low self-esteem, but can be managed with treatment. Treatment includes stimulant drugs or other medications, psychological counseling, and treatment for any other mental health conditions present. *Adult ADHD (Attention-Deficit/Hyperactivity Disorder*), MAYO CLINIC, *available at* http://www.mayoclinic.com /health/adult-adhd/DS01161 (last visited Oct. 11, 2013).

[19]     Anxiety disorder is characterized by unrealistic and excessive chronic, persistent worry about several life events such as health or finances. In addition, people suffering from this disorder often develop physical symptoms, such as headaches, fatigue, gastrointestinal discomfort, muscle tension and aches, and insomnia as a result of their chronic anxiety. *Conditions We Treat: Anxiety Disorders Program*, JOHNS HOPKINS MEDICINE, *available at* http://www.hopkinsmedicine .org/psychiatry/specialty_areas/anxiety/conditions.html (last visited Oct. 11, 2013).

This Opinion will first detail Plaintiff's physical conditions, and then turn to a discussion of her mental conditions, given the number and variety of ailments of which Plaintiff complains.

## C. Physical Conditions

### 1. 2006 Spinal Stenosis Surgery

Plaintiff underwent spinal stenosis surgery[20] on September 29, 2006 with Dr. Derek J. Thomas, M.D. at Heritage Valley Health System in Sewickley. (R. at 218). According to the Record,[21] Plaintiff had several years of lower extremity pain and her chief complaint was "bilateral lower extremity pain, left greater than right, also with some back pain." (R. at 221, 223). Dr. Thomas reported that Plaintiff had pain in the "L5[22] distributions of both legs, left more than the right." (*Id.*). Plaintiff explained to Dr. Thomas that when "she walks at her job for any length of time, she has to sit down due to the pain until it goes away." (*Id.*). In addition, standing caused Plaintiff back pain and lower extremity pain. (*Id.*). According to the History, Plaintiff had tried multiple epidural steroid injections[23] in the past that had given her some relief, but she did not want to continue pursing that option. (*Id.*). At Plaintiff's L4-5 level[24], an x-ray and an MRI

---

[20]    The purpose of spinal stenosis surgery "is to relieve pressure on the spinal cord or nerves and restore and maintain alignment and strength of the spine." *Spinal Stenosis*, NAT'L INST. OF ARTHRITIS & MUSCOSKELETAL & SKIN DISEASES, *available at* http://www.niams.nih.gov/Health_Info/Spinal_Stenosis/ (last visited Oct. 8, 2013).

[21]    The Record only contains the inpatient medical records from September 29, 2006 to October 2, 2006. (R. at 218–32). This includes an Operative Report, History and Physical Report, Discharge Summary, and lab results. (*Id.*). The pre- and post-operative examination reports are not included in the Record. However, the inpatient reports contain sufficient information detailing the history of this surgery and the events surrounding it. (R. at 223).

[22]    Vertebrae, or the bones of the spine, are named by the first letter of their region (cervical, thoracic, or lumbar) and a number to indicate their position along the spine. For example, the fifth lumbar vertebra (which is the most inferior one, located beneath the fourth lumbar vertebra) is called the L5 vertebra. *Spine*, INNER BODY, *available at* http://www.innerbody.com/image/skel05.html#full-description (last visited Oct. 11, 2013). *See also supra*, footnote 6.

[23]    "Epidural steroid injections contain drugs that mimic the effects of the hormones cortisone and hydrocortisone. When injected near irritated nerves in your spine, these drugs may temporarily reduce inflammation and help relieve pain." *Back Pain*, MAYO CLINIC, *available at* http://www.mayoclinic.com/health/epidural-steroid-injections/AN01892 (last visited Oct. 11, 2013).

[24]    The L4-5 level denotes the fourth and fifth lowest vertebrae in the lumbar spine region. See, *supra*, footnotes 6, 22

showed Grade I spondylolisthesis[25] with significant spinal stenosis, as well as significant facet arthropathy.[26] (*Id.*).

Dr. Thomas' pre- and post-operative diagnoses were spinal stenosis[27] and spondylolisthesis at the L4-L5 level. (R. at 218). Plaintiff was admitted to Heritage Valley on September 29, 2006 for surgery. (*Id.*). According to the Operative Report, he proceeded with a laminectomy[28] and fusion of L4-L5[29] using a local bone autograft[30]. (*Id.*). After placing Plaintiff under general anesthesia, Dr. Thomas and his assistant, Nancy Debranski, PA-C, "removed the posterior spinous process[31] of L4 and L5 and . . . cleaned that bone off, chopped it into small pieces and used that for a local bone autograft." (R. at 219). They then placed four screws into the bone, and noted that Plaintiff's "bone was of very good quality as the four screws all had

---

[25]    Spondylolisthesis describes a "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it." STEDMAN'S MEDICAL DICTIONARY 1813 (28th ed. 2006). A bone of the spine, or vertebrae, slips out of place, and if the bone slips too much, the bone might press on a nerve, causing pain. Usually, the bones of the lower back are affected. There are four "grades" of spondylolisthesis, depending on the percentage of slippage shown on an X-ray. Grade I is the lowest grade and ranks at one to twenty-five percent. Diseases & Conditions: *Spondylolisthesis*, CLEVELAND CLINIC, *available at* http://my.clevelandclinic.org/disorders/back_pain /hic_spondylolisthesis.aspx (last visited Oct. 11, 2013).

[26]    A facet is a small smooth area on a bone, usually an articular surface covered in life with articular cartilage. STEDMAN'S MEDICAL DICTIONARY 690 (28th ed. 2006). Arthropathy is "any disease affecting a joint." *Id.* at 161.

[27]    "Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine. Spinal stenosis occurs most often in the neck and lower back." *Spinal Stenosis*, MAYO CLINIC, *available at* http://www.mayoclinic.com/health/spinal-stenosis/DS00515 (last visited Oct. 8, 2013).

[28]    A laminectomy is a surgical procedure involving the "excision of a vertebral lamina; commonly used to denote removal of the posterior arch." STEDMAN'S MEDICAL DICTIONARY 1046 (28th ed. 2006). A lumbar laminectomy is done to remove a small portion of a vertebra in the lumbar, or back bone in the lower back. The procedure is usually done to take pressure off the spinal cord or a spinal nerve. *Lumbar Laminectomy*, UMPC, *available at* http://upmc.com/Services/neurosurgery/spine/treatment/surgery/Pages/lumbarlaminectomy .aspx?gclid=CJL8vL2 Pj7oCFe4-MgodmFAAIQ (last visited Oct. 11, 2013).

[29]    Instrumentation surgery such as a fusion of L4-5 combined with a bone graft has been widely used for degenerated lumbar spondylolisthesis. SEIJI OHTORI ET AL., *Single-level instrumented posterolateral fusion of the lumbar spine with a local bone graft versus an iliac crest bone graft: a prospective, randomized study with a 2-year follow-up*, EUROPEAN SPINE JOURNAL, Dec. 17, 2010, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3065607/ (last visited Oct. 11, 2013).

[30]    A bone autograft is "tissue or organ transferred into a new position in the body of the same person." STEDMAN'S MEDICAL DICTIONARY 185 (28th ed. 2006).

[31]    Spinous process of vertebra is "the dorsal projection from the center of a vertebral arch." STEDMAN'S MEDICAL DICTIONARY 1566 (28th ed. 2006).

excellent purchase." (*Id*.). The surgeons connected the four screws with rods, and then tested the screws, all of which were normal. (*Id*.).

After the surgery, Plaintiff spent three days recovering in inpatient care, and underwent physical therapy and occupational therapy to help her resume activities of daily living. (R. at 224). On the third day, Plaintiff "had some back soreness, [and] no leg pain." (*Id*.). A physical exam showed that her lower extremities were "intact, with 5 out of 5 strength throughout." (*Id*.). She had "slight extensor hallucs longus[32] weakness on the left side compared to the right side." (*Id*.). She was prescribed pain medication and instructed to continue with physical therapy treatments upon discharge on October 2, 2006. (*Id*.).

2.     2007 Slip and Fall Accident

On February 15, 2007 Plaintiff presented to Heritage Valley Health System's emergency room because she fell down a flight of outdoor stairs while shoveling snow and ice. (R. at 233). Upon examination, Denise Ramponi, CRNP reported that Plaintiff had "mild tenderness throughout" the lumbar area[33] and a "moderate amount of soft-tissue swelling with a mild hematoma[34] on the right sacroiliac joint[35]." (*Id*.). Plaintiff demonstrated "increasing pain with

---

[32]     Extensor is used to describe a muscle contraction that "causes movement at a joint with the consequence that the limb or body assumes a more straight line, or so that the distance between the parts proximal and distal to the joint is increased or extended." STEDMAN'S MEDICAL DICTIONARY 686 (28th ed. 2006). Hallucs extensus is "a deformity in which the great toe is held rigidly in the extended position." *Id*. at 848.
[33]     The lumbar area refers to the middle part of the spine. *See supra*, footnote 6.
[34]     A hematoma is "a localized mass of extravasated blood that is relatively or completely confined within an organ or tissue." STEDMAN'S MEDICAL DICTIONARY 863 (28th ed. 2006).
[35]     The sacroiliac joint is the joint connecting the sacrum and the ilia. *Id*. at 1714. The sacrum is "the segment of the vertebral column forming part of the pelvis; a broad, slightly curved, spade-shaped bone...it articulates with the last lumbar vertebra, the coccyx, and the hip bone on either side." *Id*. The iliais "the broad, flaring portion of the hip bone." *Id*. at 947.

any right hip movement, although most of [her] pain seem[ed] to be more posteriorly[36]." (*Id.*).

Examination also showed contusions[37] at Plaintiff's lumbar area and right hip. (R. at 238).

An X-ray showed no fracture or dislocation of either hip. (R. at 235). X-rays of her spine showed no acute fracture or dislocation, but did show spondylosis in Plaintiff's lower cervical spine[38] and the bilateral pedicle screws at L4-L5. (R. at 236–37). Plaintiff was prescribed twelve Vicodin[39] for her pain and was instructed to follow up with Dr. Thomas, her orthopod, in two days as "further clinical evaluation [was] indicated." (R. at 234, 236). There is no evidence of this follow-up in the Record.

### 3.   Automobile Accident

Plaintiff was involved in a car accident on June 4, 2009, after which she began experiencing neck muscle pain on the right side and some pain down into her right arm. (R. at 251). Plaintiff was subsequently seen at Greater Pittsburgh Orthopedic Associates on June 22, 2009, at which time Dr. Derek Thomas diagnosed her with a herniated disc. (*Id.*). He ordered an MRI and prescribed Vicodin. (*Id.*). The MRI was performed on June 28, 2009, and Plaintiff followed up with Dr. Thomas on July 14, 2009 to review the results. (R. at 250). Upon review, Dr. Thomas diagnosed Plaintiff with cervical stenosis and a new herniated disc at C4-5 and C5-

---

[36]    Posteriorly, when referring to human anatomy, denotes "the back surface of the body. Often used to indicate the position of one structure relative to another, i.e., nearer the back of the body." STEDMAN'S MEDICAL DICTIONARY 1546 (28th ed. 2006).

[37]    A contusion is "any mechanical injury (usually caused by a blow) resulting in hemorrhage beneath unbroken skin." STEDMAN'S MEDICAL DICTIONARY 437 (28th ed. 2006).

[38]    Cervical spondylosis is a general term for age-related wear and tear affecting the spinal disks in the neck. As the disks dehydrate and shrink, bone spurs and other signs of osteoarthritis develop. More than 90 percent of people older than age 65 have evidence of cervical spondylosis and osteoarthritis that can be seen on neck X-rays. Most of these people experience no symptoms from these problems. When symptoms do occur, nonsurgical treatments often are effective. *Cervical Spondylosis*, MAYO CLINIC, *available at* http://www.mayoclinic.com/health/cervical-spondylosis/DS00697 (last visited Oct. 11, 2013).

[39]    Vicodin is a combination of acetaminophen and hydrocodone. "Hydrocodone is in a class of medications called opiate (narcotic) analgesics and in a class of medications called antitussives. Hydrocodone relieves pain by changing the way the brain and nervous system respond to pain." *Hydrocodone*, MEDLINE PLUS, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (last visited Oct. 7, 2013).

6. (*Id.*). Plaintiff was told the risks and benefits of possible treatment options, but she and Dr. Thomas decided to "wait and see how things go." (*Id.*). Dr. Thomas advised Plaintiff that she could return to work at her regular job and follow up in the future. (*Id.*).

### 4. Gallbladder Removal

Plaintiff underwent surgery to remove her gallbladder on March 1, 2010, as performed by Dr. Giselle G. Hamad, M.D., of UPMC at Magee-Womens Hospital. (R. at 341, 348). She presented to Dr. Hamad in February with abdominal pain intermittently over the past 20 years, made worse by fatty or spicy foods. (R. at 346). Dr. Hamad diagnosed Plaintiff with cholelithiasis.[40] After the exam, Plaintiff agreed to undergo a laparoscopic cholecystectomy.[41] (R. at 347). According to a letter from Dr. Hamad to Dr. Anand, Plaintiff went to the emergency room two days after surgery, complaining of abdominal pain. (R. at 341). She missed her follow-up appointment with Dr. Hamad, but three weeks later was seen again, at which point she was advised that she could return to her normal activities, and her incisions were healing. (R. at 343).

### 5. Type II Diabetes and Hypothyroidism

Plaintiff presented to Dr. Mona Anand, M.D., on January 12, 2011, after she obtained health insurance. (R. at 372). She complained of numerous medical conditions, including asthma, thyroid dysfunction, and hypertension, for none of which she was taking medication, and claimed she was told three years prior that she was "prediabetic." (*Id.*). She also reported symptoms from ADHD, bipolar disorder, and anxiety, for all of which she was being treated.

---

[40] Cholecystitis is an inflammation of the gallbladder, usually caused by gallstones that have blocked the tube leading out the gallbladder, causing bile to build up. *Cholecystitis*, MAYO CLINIC, *available at* http://www.mayoclinic.com/health/cholecystitis/DS01153 (last visited Oct. 10, 2013).

[41] A laparoscopic cholecystectomy is "a surgical procedure to remove your gallbladder." This is a common surgery that is "performed by inserting a tiny video camera and special surgical tools through four small incisions to see inside your abdomen and remove the gallbladder." *Cholecystectomy*, MAYO CLINIC, *available at* http://www.mayoclinic.com/health/cholecystectomy/MY00372 (last visited Oct. 10, 2013).

(*Id*.). Plaintiff reported "her mental health is not the best at this time," but she had no suicidal thoughts or intents. (*Id*.). Upon physical examination, Dr. Anand found Plaintiff's blood pressure was 132/90, and her chest was clear but "a few wheezes [were] heard." (R. at 373). Plaintiff complained of some chest pressure and shortness of breath on exertion. (*Id*.). Dr. Anand ordered numerous tests, mainly to check Plaintiff for possible coronary artery disease and for overall health maintenance. (*Id*.). She also assessed Plaintiff as suffering from hypertension with "borderline elevated pressures," and for which she prescribed a low-salt diet. (R. at 374).

Upon follow-up to review test results, Plaintiff's blood work showed evidence of new-onset Type II Diabetes. (R. at 367). Dr. Anand reported that they "discussed the diagnosis of diabetes at length," and she explained the lifestyle changes that Plaintiff would have to make. (*Id*.). She prescribed Glucophage[42] 1000 mg twice a day, consultation with a dietician, and a glucometer for checking her blood sugars regularly. (R. at 367–68). In addition to the Type II Diabetes diagnosis, there was also evidence of hypothyroidism.[43] For this, Dr. Anand prescribed Plaintiff with Synthroid[44] 25 mcg daily. (R. at 368). At the ALJ hearing, Plaintiff testified that "everything seems to be [in] line right now," and that her "sugars are stable." (R. at 48).

6.    Asthma

Dr. Anand reported on January 12, 2010 that Plaintiff had a history of asthma, but was not on any inhalers and was very stable. (R. at 372). Plaintiff complained of shortness of breath

---

[42]    Glucophage, or Metformin, "helps to control the amount of glucose (sugar) in your blood. It decreases the amount of glucose you absorb from your food and the amount of glucose made by your liver. Metformin also increases your body's response to insulin, a natural substance that controls the amount of glucose in the blood." *Metformin*, MEDLINE PLUS, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html (last visited Oct. 7, 2013).
[43]    *See supra* footnote 15.
[44]    "Levothyroxine [or Synthroid,], a thyroid hormone, is used to treat hypothyroidism, a condition where the thyroid gland does not produce enough thyroid hormone." *Levothyroxine*, MEDLINE PLUS, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682461.html (last visited Oct. 7, 2013).

on exertion, and her chest examination was clear with a few wheezes heard. (*Id.*). Dr. Anand prescribed an inhaler[45] to take two puffs, as needed. (R. at 375). In March of 2010, during a Bureau of Disability Determination exam, Dr. Daniel G. Christo of Sewickley Valley Medical Group reviewed Plaintiff's symptoms and reported that she uses an inhaler to treat asthma. (R. at 329–30). Upon examination, he noted that Plaintiff's lungs were clear with no rales or wheezing, but found that Plaintiff had asthma with an unremarkable pulmonary exam, concurring with Dr. Anand's assessment. (R. at 329, 331, 333).

7.    Sleep Apnea

Dr. Anand also assessed Plaintiff with sleep apnea[46] and referred her to a sleep clinic for a repeat sleep study on January 12, 2010. (R. at 374). Plaintiff complained that she had a history of sleep apnea but was currently not using a mask, although she experiences excessive snoring, and feels very tired and fatigued. (R. at 388). According to a November 2009 psychiatric progress report, Plaintiff reported getting seven to eight hours sleep; however, she later testified at the June 14, 2011 ALJ hearing that she usually sleeps about four to six hours, and uses a sleep apnea machine. (R. at 61). Dr. Christo examined Plaintiff in March of 2010, and noted that she had a history of sleep apnea, but did not bring that up as an issue at her examination. (R. at 332). In a December 2010 neuropsychological evaluation, Plaintiff reported she either "sleeps too much or not at all." (R. at 514). Dr. Glen Getz, Ph.D., a clinical neuropsychologist at Allegheny General Hospital, surmised that it was likely that a combination of her psychiatric difficulties and sleep-related problems was contributing to her subjective cognitive problems. (*Id.*). He

---

[45]    The prescription was for Albuterol Sulfate (Ventolin Rotahaler/Roacaps) 200 mcg Inhl CpCv. (R. at 375). Albuterol is used to prevent and treat wheezing, shortness of breath, coughing, and other symptoms caused by asthma. *Albuterol Oral Inhalation*, NATIONAL INSTITUTE OF HEALTH, *available at* http://www.nlm.nih.gov/medlineplus/druginfo /meds/a682145.html (last visited Oct. 11, 2013).
[46]    *See supra* footnote 10.

recommended she consistently utilize her C-Pap machine[47] and possibly undergo an additional sleep study. (*Id*.).

        8.    <u>Consultative Examination with Dr. Daniel Christo, D.O.</u>

As mentioned above, on March 17, 2010 Plaintiff underwent an examination by Dr. Christo, the transcript of which was sent to the Bureau of Disability Determination. (R. at 329). Dr. Christo reported to the Bureau that Plaintiff was very vague in her medical history and told him, "my body doesn't work anymore." (*Id*.). Dr. Christo claimed that Plaintiff seemed "alert, oriented with no overt signs of thought disorder, mania, or depression." (R. at 331). Plaintiff stated to Dr. Christo that she has a poor attention span, and often has problems following and remembering instructions. (R. at 329). Plaintiff could add simple and complex numbers without any difficulty, and followed directions well. (R. at 331). Dr. Christo assessed Plaintiff's mental health with a "history of bipolar disorder, possibly attention deficit disorder with no overt signs of thought disorder, mania, or depression," and intact gross mental skills.[48] (R. at 332).

Upon physical examination, Plaintiff's neck "actually show[ed] good range of motion," and was nontender with no specific spasms. (R. at 331). Dr. Christo tested her range of motion, and found her forward and backward flexion, rotation, and side bending were "unremarkable," and that Plaintiff could go from sitting to supine, and supine to sitting without any difficulties. (*Id*.). Her upper extremities tests showed she had full range of motion at the shoulders, elbows and wrists, with 100 percent grip strength and a normal gait. (R. at 332). As to her lower

---

[47]      "CPAP, or continuous positive airway pressure, is a treatment that uses mild air pressure to keep the airways open. CPAP typically is used by people who have breathing problems, such as sleep apnea." *What is C-PAP?*, NAT'L HEART, LUNG, & BLOOD INST., *available at* http://www.nhlbi.nih.gov/health/health-topics/topics/cpap/ (last visited Oct. 7, 2013).
[48]      Dr. Christo additionally noted that he had no psychiatric documentation for Plaintiff's mental health history. (R. at 332).

extremities, she showed a negative straight leg raise both sitting and lying with a full range of motion in her hips, knees, and ankles. (*Id.*). Dr. Christo reported Plaintiff "gave a poor attempt at standing forward flexion," that she "basically did not even try." (*Id.*). Overall, Dr. Christo assessed Plaintiff with lumbar disc disease and cervical disc disease with no significant clinical objective findings. (*Id.*).

Dr. Christo recommended that Plaintiff be limited to only occasional bending, kneeling, stooping, crouching, balancing, and climbing. (R. at 337). He assessed her ability to work full-time in a regular work setting as limited to frequently lifting or carrying up to 25 pounds (out of a possible 100 pounds.). (R. at 338). Because of her asthma, he also recommended environmental restrictions from areas of poor ventilation, wetness, dust, fumes, odors, and gases. (R. at 337). He did not recommend any restrictions with respect to standing, walking, sitting, pushing, pulling, reaching, handling, hearing, or speaking. (R. at 337–38).

9.      Left Hip Bursitis

In January 2011, Plaintiff presented again to Dr. Mona Anand, M.D. with left hip pain that sometimes shoots down into her legs. (R. at 440). Dr. Anand ordered an MRI and reviewed the results with Plaintiff a few weeks later. (R. at 438). The MRI was "essentially unremarkable," but did show evidence of trochanteric bursitis,[49] for which Dr. Anand performed a kenalog injection.[50] (*Id.*). As Plaintiff's left hip was "extremely painful for her," Dr. Anand assessed her with osteoarthritis[51] and prescribed Mobic 7.[52] (R. at 438–39).

---

[49]     Trochanteric bursitis is bursitis of the trochanter, which is "one of the bony prominences developed from independent osseous centers near the proximal end of the femur." STEDMAN'S MEDICAL DICTIONARY 2035 (28th ed. 2006). *See supra* footnote 7.

[50]     A Kenalog injection is a corticosteroid hormone used for a variety of conditions such as arthritis. The injection works by decreasing your body's immune response and reduces symptoms such as swelling. *Drugs &*

10. 2011 Spinal Stenosis Surgery

At the same appointment for her left hip pain, Plaintiff also complained of severe lower back pain. (R. at 440). In addition to the MRI of her left hip, Dr. Anand ordered an additional MRI of Plaintiff's lumbar spine and cervical spine. She then reviewed the results with Plaintiff on February 7, 2011. (R. at 438). The MRI of the lumbar spine showed "significant degenerative changes," and she recommended Plaintiff complete physical therapy in addition to a follow-up visit with an orthopedic specialist. (*Id*.).

As such, Plaintiff was referred to Dr. Joon Y. Lee, M.D. of UPMC Presbyterian, who recommended surgery due to her symptoms "progressively getting worse" in the last four years, specifically a posterior laminectomy[53] for spinal stenosis at the C3-4, C4-5, C5-6, and C6-7 levels. (R. at 435, 462, 466–67). At her February 24, 2011 pre-operative examination, Dr. Lee noted and discussed with Plaintiff that "she will lose most likely about 30% of her motion" in addition to other possible risks associated with surgery. (R. at 467). He stated "the goal of the surgery is to halt the progression of the symptoms, not necessarily to reverse the symptoms." (*Id*.). After this exam and before the surgery, Plaintiff presented to Dr. Anand for an unrelated physical condition and further discussed the impending surgery. (R. at 435–36).

---

*Medications - Kenalog Inj*, WEBMD, *available at* http://www.webmd.com/drugs/drug9275Kenalog+Inj.aspx? drugid=9275&drugname=Kenalog+Inj (last visited Oct. 11, 2013).
[51] *See supra* footnote 12.
[52] Mobic, or meloxicam, is in a class of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs) and are used to treat pain and/or inflammation. *Meloxicam, Mobic*, MEDICINENET, *available at* http://www.medicinenet.com/meloxicam/article.htm (last visited Oct. 11, 2013).
[53] *See supra* footnote 28.

Assisted by Amanda Britton, PA-C, Dr. Lee performed the surgery two weeks later on April 11, 2011 at UPMC Presbyterian Shadyside. (R. at 468). Both the pre- and post-operative diagnoses were cervical spinal stenosis with myeloradiculopathy.[54] (*Id*.).

The Operative Report shows an incision was made and Plaintiff was exposed from C3 down through C7. (R. at 469). A bone graft was taken from her left iliac crest[55], and surgeons then placed screws on her bilateral C3 through C7 levels. (*Id*.). Rods and cap screws were placed near the screws, completing the instrumentation insertion portion of the surgery. (*Id*.). The bone graft that was taken from the left iliac crest was then packed onto the lateral gutters to span from C3 through C7 to ensure that there was complete coverage of the decorticated material as well as the decorticated facets. (*Id*.). Next, the doctors performed a posterior laminectomy from C3 through C7 and resected the interspinous ligament between C2-C3 and C6-C7. (*Id*.). After closing, doctors took an x-ray of Plaintiff to ensure that the instrumentation was satisfactory. (*Id*.). According to the report, there were no complications throughout the entire case. (R. at 470).

The next three days, Plaintiff remained in UMPC's care, where she was tended to by medical consultants and participated in physical therapy. (R. at 471, 473). She was discharged on April 14, 2011 with instructions to wear her neck brace at all times and follow up in three weeks. (*Id.*). Plaintiff was transferred to HCR Manor Care, a skilled nursing facility, for two additional days of recovery. (R. at 473, 577). At HCR, her physical examination showed Plaintiff had abnormal weakness, pain, and limited range of motion in her extremities. (R. at 475). She was given a neck brace and discharged on April 16, 2011. (R. at 476–77).

---

[54]    Myeloradiculopathy is a disease involving the spinal cord and nerve roots. STEDMAN'S MEDICAL DICTIONARY 1270 (28th ed. 2006).

[55]    *See supra* footnotes 30, 35.

During her May 5, 2011 follow-up appointment with Dr. Lee, Plaintiff stated that "she is doing well today," and her upper extremity numbness, tingling, and weakness had improved "almost immediately after surgery." (R. at 465). She occasionally took Oxycodone[56] and Neurontin[57] for her pain, and reported no weakness or radicular symptoms. (*Id*.). Dr. Lee restricted Plaintiff to lifting no more than 10 to 15 pounds, and no overhead lifting more than 10 to 15 pounds, and refilled her Neurontin and Oxycodone prescriptions.[58] (*Id*.).

### D.    Mental Health Conditions

When Plaintiff applied for DIB and SSI benefits, in addition to her physical limitations, she claimed mental conditions including learning disabilities, bipolar disorder, ADHD, and anxiety disorder limited her ability to work. (R. at 166). She has undergone exams and counseling by numerous doctors as treatment for these conditions. (R. at 171). When being treated for her physical conditions, Dr. Anand assessed Plaintiff with bipolar and anxiety disorder with ADHD, stating she will continue psychiatric treatment and noted no suicidal ideation. (R. at 381, 388, 389). Witness statements by friend and roommate, Shaun Crandall, describe "memory issues which hinder training and learning new things." (R. at 208). Plaintiff's friend, former partner and roommate, Shayla Maas, also stated that she "has frequent memory problems, especially short term, [and] she often loses track of a conversation mid-sentence, or forgets instructions she was given in the last [five to fifteen] minutes." (R. at 209). In her

---

[56]    Oxycodone is "a narcotic analgesic often prepared with aspirin or acetaminophen." STEDMAN'S MEDICAL DICTIONARY 1400 (28th ed. 2006).

[57]    Neurontin is used to treat neuropathic pain, a type of pain caused by damage to the nerves, as well as epilepsy. *Neurontin*, MEDICALNEWS, *available at* http://www.news-medical.net/drugs/Neurontin.aspx (last visited Oct. 11, 2013).

[58]    On July 14, 2011, after her Administrative Hearing, Plaintiff had an additional follow-up with Dr. Lee. (R. at 636). He reported that her "x-rays look[ed] good," and lifted her restrictions, stating that she could "go back to her normal activities." (*Id*.). At her six-month follow-up, Dr. Lee stated that "the fusion looks pretty solid with no instrumentation problems," according to the most recent December 2011 x-ray. (R. at 635). He wrote to Dr. Anand that a one-year follow up was requested, "which may be her last follow-up from our standpoint." (*Id*.).

Disability Report Appeal, Plaintiff stated that she becomes overwhelmed by public and social situations, and that she gets "depressed and sleep[s] for several days at a time." (R. at 210).

1. Attention Deficit Hyperactivity Disorder ("ADHD") and Short Term Memory[59]

On July 23, 2009, Plaintiff was referred to Dr. Dominic J. DeLuigi, Ph.D. for a Comprehensive Psychological Vocational Assessment to determine her potential for training and optimal occupational objective. (R. at 257). At the assessment, Plaintiff told Dr. DeLuigi that she was an above average student in high school, and took a variety of courses at various schools after graduating. (R. at 261). Dr. DeLuigi noted Plaintiff's appearance and comprehension of simple commands were appropriate, and her stream of speech was logical and coherent. (*Id.*). Plaintiff denied any current or previous homicidal or suicidal ideations. (R. at 262).

After running some cognitive tests, Dr. DeLuigi found that Plaintiff's short-term memory was impaired, as well as her attention and concentration abilities. (R. at 261). Her Wechsler Adult Intelligence Scale[60] showed Plaintiff had an IQ of 90, which is in the average range. (R. at 262). An analysis of the composite scores showed a relative weakness regarding short-term working memory. (*Id.*). Her results also showed weaknesses for visual analysis and synthesis, verbal abstract reasoning, and quantitative thinking. (*Id.*). Her aptitude profile was consistent in that Plaintiff has average abilities for verbal and spatial aptitudes, and below average numerical and perceptual aptitudes and manual dexterity. (*Id.*). According to Dr. DeLuigi, these tests supported "average training aptitude." (*Id.*). Her numerical aptitude showed relative weakness,

---

[59]     Because Plaintiff's ADHD and short term memory ability symptoms are interrelated throughout her medical record, this Opinion will discuss them together.
[60]     The Wechsler Adult Intelligence Scale (WAIS) is a test designed to measure intelligence in adults and older adolescents. WAIS, *available at* http://wechsleradultintelligencescale.com/ (Last visited on Oct. 11, 2013).

and Dr. DeLuigi suggested Plaintiff's poor quantitative thinking is related to "attentional dysfunctioning rather than a specific learning disability." (*Id*.). Plaintiff showed "poor sustained attention and response inhibition (impulsivity)," relative to her age and gender peers. (*Id*.).

Dr. DeLuigi opined that Plaintiff's test results show "evidence of executive dysfunctions, particularly poor response inhibition; dysregulation of attention, behavior, and emotions; and attentional dysfunctioning" consistent with ADHD. (R. at 264). He concluded that she suffers from a "reduced capacity to retain and learn at an acceptable rate through traditional means, and impaired life planning and self-direction." (*Id*.). He also noted evidence of "diminished physical capacity." (*Id*.). As such, Dr. DeLuigi diagnosed Plaintiff with ADHD and recommended various accommodations and life management strategies to manage her limitations. (R. at 264–70).

Plaintiff began therapy with Callie J. Cooper, LSW at the Charte Center, Inc. in Pittsburgh to treat her ADHD, as well as her other mental conditions in December 2009. (R. at 302, 409). Ms. Cooper provided a treatment summary dated February 8, 2010 detailing their previous six therapy sessions. (*Id*.). She reported that Plaintiff's disorders interfere with her ability to focus when given instructions, and she displays short term memory problems from session to session. (*Id*.). She noted that Plaintiff missed one of their sessions because she forgot what day of the week it was. (*Id*.). Ms. Cooper observed that Plaintiff "is bright and has a great deal of knowledge," but has difficulty demonstrating this knowledge in situations where she becomes anxious and unfocused. (*Id*.). Yet, Plaintiff was "making attempts to focus on her treatment and to improve her situation." (*Id*.).

In addition to the treatment summary, Ms. Cooper completed a Medical Source Statement of Ability to Do Work-Related Activities for the Bureau of Disability Determination in February of 2010. (R. at 304, 307). Regarding Plaintiff's ADHD, Ms. Cooper assessed Plaintiff with

extreme limitations when understanding, remembering, and carrying out detailed instructions. (R. at 305). Plaintiff had marked limitations regarding her ability to understand, remember, and carry out short, simple instructions, as well as making judgments or simple work-related decisions. (*Id.*). Ms. Cooper attributed these limitations to Plaintiff's anxiety resulting from difficulty following directions, in addition to her ADHD. (*Id.*). She also rated Plaintiff as having extreme restrictions responding appropriately to work pressures and changes in a usual work setting, and marked restrictions interacting appropriately with the public, supervisors, or co-workers due to her ADHD. (*Id.*).

### 2. Anxiety and Bipolar Disorders

Plaintiff has been diagnosed with Anxiety and Bipolar Disorders for a number of years, and claims this disorder limits her ability to work. (R. at 166, 171, 262, 302). Drs. Sinu, DeLuigi, and Anand have all confirmed her diagnoses. (R. at 258, 276, 382). Plaintiff testified that her anxiety symptoms were the most debilitating out of all of her physical and mental conditions. (R. at 64). Shayla Maas's witness statement explained that Plaintiff displays "aggressive, irrational, angry outbursts." (R. at 209). Plaintiff testified at her hearing that her treatments at the Staunton Clinic and Charte Center help her to manage her symptoms. (R. at 55). As of that date, Plaintiff was taking Xanax[61] twice a day regularly and one additional instance, if needed. (R. at 63). When the ALJ asked if she experienced any depressed or manic modes, Plaintiff answered in the affirmative and claimed that she has "ups and downs," but that her medication was helping her. (R. at 56–57). She explained that she "can get so manic that I cannot actually sort out and get

---

[61]     Xanax is used to treat anxiety and panic disorders. It belongs to a class of medications called benzodiazepines which act on the brain and nerves (central nervous system) to produce a calming effect. It works by enhancing the effects of a certain natural chemical in the body (GABA). *Drugs and Medications: Xanax Oral*, WEBMD, *available at* http://www.webmd.com/drugs/drug-9824-Xanax+Oral.aspx?drugid=9824&drugname= Xanax+Oral (last visited Oct. 11, 2013).

things done," and the disorder causes her to feel depressed, which further limits her ability to complete tasks. (R. at 57).

During her evaluation with Dr. DeLuigi, Plaintiff told him that she was diagnosed with bipolar disorder in 1991, and underwent a psychiatric hospitalization once. (*Id*.). He wrote that she has received pharmacological treatment on an ongoing basis, but was having difficulty purchasing her medication due to lack of funds. (*Id*.). Dr. DeLuigi recommended she continue to receive pharmacological treatment and encouraged her to apply for SSI to finance these medications, and to continue psychotherapy. (R. at 265). He noted her predominant mood during the evaluation was euthymic.[62] (R. at 262).

Her treatment at the Staunton Clinic with Dr. Sinu from August 2006 to November 2009 reports mostly normal moods and no thoughts of suicide ideation. (R. at 276–83). Dr. Sinu saw Plaintiff about once a month over three years, and consistently noted that she appeared well groomed. (*Id*.). Notably, throughout various appointments Plaintiff discussed with Dr. Sinu that she was at the point of losing her job at Wal-Mart, she suffered depression and anxiety symptoms, but was generally doing well on her medication. (R. at 277, 279, 281). Her last appointments in July and November of 2009 report a stable and euthymic mood. (R. at 276–77).

In November 2009, Dr. Sinu completed an Employability Examination for the Department of Public Welfare. (R. at 300–01). On this form, Dr. Sinu noted that Plaintiff's primary diagnosis is Bipolar Disorder, and that he assessed Plaintiff to be temporarily disabled, with the disability precluding gainful employment beginning November 16, 2009, and which he expected would last until August 30, 2010. (R. at 301).

---

[62]    Euthymic, or euthymia, in regards to mental health, is defined as "moderation of mood, not manic or depressed." STEDMAN'S MEDICAL DICTIONARY 678 (28th ed. 2006).

3.    <u>Neurological Evaluations</u>

Dr. Anand referred Plaintiff to Dr. Stephen Shymansky, M.D. for a neurological evaluation in May of 2010 at Greater Pittsburgh Neurology Consultants. (R. at 362). She presented to him with numerous neurologic symptoms, her greatest concern being a decline in short-term memory. (R. at 363). Plaintiff described "difficulty at times with remembering directions," and often became confused or lost while driving to familiar places. (R. at 362). Compared to her short-term memory, Plaintiff stated her "remote memory seems to be much more intact," and that she understood written language better than verbal. (*Id.*). Dr. Shymansky detailed Plaintiff's neck pain subsequent to the June 2009 car accident, ongoing treatment for her bipolar disorder and anxiety, and additional conditions including restless leg syndrome, diabetes, sleep apnea, and hypertension. (R. at 362–63). He also noted that Plaintiff's "medical history is remarkable for nine or ten concussions over the years." (R. at 362). His review of her symptoms listed "intermittent weight loss, lack of energy, difficulty sleeping, blurred vision, abdominal pain, frequent nausea, diarrhea, cramping, muscle pain, weakness, [and] joint pain," as well as abnormal thyroid studies. (R. at 363).

Dr. Shymansky opined that Plaintiff appeared alert and pleasant, with clear and articulate speech. (*Id.*). She had normal gait and 5/5 strength in her arms and legs, but had deep tendon reflexes absent at the ankles and knees. (*Id*). Other than a decreased sensation to pinprick at the high shin level in both lower and upper extremities, Plaintiff's sensation was completely normal. (*Id.*). Plaintiff scored 28 out of 30 on a Folstein Mini-Mental Status Examination.[63] (*Id.*). Dr.

---

[63]    The Folstein Mini-Mental Status Examination (MMSE) is the most commonly used test for complaints of memory problems. It is a series of questions and tests used to help diagnose dementia. The MMSE tests a number of different mental abilities, including a person's memory, attention and language. In general, scores of 27 or above

Shymansky determined that Plaintiff's short-term memory problems may be caused by multiple factors relating to her thyroid disease,[64] the multiple medications she currently takes, as well as bipolar disorder, sleep apnea, and her past concussions. (*Id*.). To examine this further, Dr. Shymansky ordered EEG testing and an MRI scan of Plaintiff's brain. (*Id*.). Regarding her lower extremity numbness, he assessed that Plaintiff "has a neuropathy that is likely from diabetes." (*Id*.). Her right upper extremity was to be "EMG'd" to look for cervical radicular disease related to the June 2009 car accident. (*Id*.). Finally, Dr. Shymansky stated that "because of episodes of spacing out, [he was] concerned about the possibility of complex partial seizures," and ordered additional testing to determine if that was causing Plaintiff's memory problems. (*Id*.).

A month later on July 15, 2010, Michael Tometsko, PA-C, also of Greater Pittsburgh Neurology Consultants, reviewed Plaintiff's results. (R. at 361). The MRI scan, EMG, and EEG all came back normal. (*Id*.). Mr. Tometsko reported that Plaintiff displayed no tremor, cogwheeling, or rigidity, and her face was equal, tongue was midline, and extraocular movements were intact. (*Id*.). Plaintiff had "good short-term and long-term recall in discussing her medical history." (*Id*.). Mr. Tometsko noted her thyroid was being "adequately treated," and that her problems of zoning and memory loss could be side effects from her prescribed medications.[65] (*Id*.). However, he wanted to "check a 24-hour EEG for completeness to rule out complex partial seizures," but suspected this would return normal.[66] (*Id*.).

---

(out of 30) are considered normal. *The Mini Mental State Examination (MMSE)*, ALZHEIMER'S SOCIETY, *available at* http://www.alzheimers.org.uk/site/scripts/documents_info.php?documentID=121 (last visited Oct. 18, 2013).

[64]    Dr. Shymansky believed that Plaintiff's thyroid disease could be the main cause for her memory problems, and noted that the condition was "now being corrected." (R. at 363).

[65]    At the time, Plaintiff reported to Dr. Shymansky that she was currently taking Lithium and Celexa for bipolar disorder, Trazodone for Restless Leg Syndrome, Xanax for anxiety, and Metformin and Zantac for diabetes. (R. at 362).

[66]    The results of this 24-hour EEG are not included in the Record.

Plaintiff underwent a second neurological examination in December 2010 after Dr. Anand and Ms. Cooper recommended further evaluation of her short-term memory loss and other psychological problems. (R. at 382, 509). On December 16, 2010, Plaintiff underwent a neuropsychological evaluation by Dr. Getz. (R. at 509, 514). There, Plaintiff reported difficulties in following directions, learning, making judgments, and short-term memory problems. (*Id.*). She claimed she frequently gets lost while driving, and has occasionally left the oven on. (*Id.*). Regarding her emotional functioning, Plaintiff described experiencing multiple panic attacks, and mood related difficulties such as periods of feeling hopeless and worthless. (*Id.*). She allegedly avoids public settings because of her social anxiety. (R. at 509–10).

Dr. Getz ran numerous tests, which results he believed to be "an accurate reflection of her current level of cognitive functioning." (R. at 511). Considering these test results, Dr. Getz found they "indicate intact performance on objective measures of cognitive functioning in all areas with the exception of mild attention difficulties, slowed cognitive efficiency and slowed fine motor skills." (R. at 513). He attributed these difficulties to her history of psychiatric problems, particularly anxiety and bipolar disorders. (*Id.*). Regarding Plaintiff's ADHD, however he found that she did "not demonstrate symptoms consistent" with the disorder or any underlying cognitive problems. (*Id.*).

Of note, Dr. Getz observed that it was "possible that her current medication regimen, particularly the Xanax, could be contributing to the slowed cognitive efficiency," but nevertheless found that consistent treatment will be important given her history of anxiety. (R. at 513–14). He stated that Plaintiff's "slowed cognitive efficiency and fine motor difficulties as well as inconsistent concentration is likely contributing to her inconsistent abilities in daily living." (R. at 514). Dr. Getz emphasized that Plaintiff "has cognitive abilities to perform these

25

skills well and that there is no clear underlying organic etiology to her difficulties," except for her anxiety and mood disorders. (*Id*.). On the other hand, Plaintiff "is at high risk for sustaining mild cognitive impairment in the future," and should be reevaluated in at least two to three years if she notices any decline of cognitive functioning. (*Id*.).

## E. Functional Capacity

### 1. Physical Residual Functional Capacity

Plaintiff underwent a physical residual function capacity ("RFC") assessment by state evaluator Kimberly Stavish on March 31, 2010. (R. at 72–79). Dr. Stavish diagnosed Plaintiff with cervical disc herniation, lumbar degenerative disc, asthma, and bipolar disorder. (R. at 72). The following exertional limitations were established: Plaintiff could occasionally lift and/or carry twenty pounds and frequently carry ten pounds; was limited to standing and/or walking for six hours in an eight-hour workday; could sit for about six hours in an eight-hour workday; and was unlimited in her ability to push and/or pull, aside from his previously noted restrictions in lifting and/or carrying. (R. at 73). In Dr. Stavish's opinion, Plaintiff would be occasionally limited in the following postural movements: using ramps, climbing stairs, ladders, rope, or scaffolds; balancing; stooping; crawling; crouching; and kneeling. (R. at 74). However, Plaintiff had no manipulative, visual, or communicative limitations, and her environmental limitations were unaffected, except that Plaintiff was cautioned to avoid concentrated exposure to wetness, humidity, fumes, odors, dusts, gases, and poor ventilation. (R. at 74–75). Dr. Stavish also found Plaintiff's statements to be partially credible based on the evidence in the record. (*Id.*). He then

found the RFC to be consistent with the report of Daniel Christo, D.O.[67] and other evidence in Plaintiff's file. (R. at 78).

2. <u>Mental Residual Functional Capacity</u>

On February 12, 2010, Phyllis Brentzel, Psy.D. conducted a Mental RFC, including both a Functional Capacity Assessment and a Psychiatric Review Technique. (R. at 309–11). The mental RFC report shows that Plaintiff is moderately limited in her abilities to understand and remember detailed instructions; to carry out very short and simple instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to complete a normal workday and workweek and perform at a consistent pace; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; and to set realistic goals or make plans independently. (R. at 309–10). She is markedly limited in her ability to carry out detailed instructions. (*Id*.). Plaintiff is not significantly limited in her abilities to remember locations and work-like procedures; to understand and remember very short and simple instructions; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to supervisors; to relate to coworkers; to maintain socially appropriate behavior and appearance; or to travel in unfamiliar places and use public transportation. (*Id.*).

---

[67]     *Supra* Part III.C.8.

Dr. Brentzel found Plaintiff's statements to be partially credible, even upon review of Dr. Sinu's report and consideration of his opinion. (R. at 311). Overall, Dr. Brentzel determined that Plaintiff has limited "ability to understand and remember complex or detailed instructions," but that "she would be expected to understand and remember simple one and two step instructions." (*Id.*). Ultimately, Dr. Brentzel concluded that Plaintiff "is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment." (*Id.*).

## F.     Administrative Hearing

A hearing regarding Plaintiff's claims was held before Administrative Law Judge John Kooser on June 14, 2011 at the Office of Disability Adjudication and Review in Seven Fields, Pennsylvania. (R. at 35). Plaintiff appeared to testify, accompanied by her non-attorney representative, Barbara Manna. (*Id.*). Karen Krull,[68] an impartial Vocational Expert ("VE"), also appeared and testified. (R. at 35, 65–68).

Plaintiff testified that she was fifty (50) years old, having a birth date of July 17, 1960. (R. at 39). She was five feet, five inches tall, and weighed approximately one hundred and eighty (180) pounds, although her weight regularly fluctuated within a twenty (20) pound range because of stress eating. (R. at 40). Plaintiff was single and did not have children. (*Id.*). She stated that she has a driver's license, but had not driven in several months because she was not yet

---

[68]     Karen Krull earned her Bachelor of Science at the University of Pittsburgh, and her Masters in Education, Rehabilitation Counseling, at the University of Pittsburgh. (R. at 122). She has been self-employed as a vocational rehabilitation consultant since 1987. From 1984 through 1987, she was a Manager of Disability and Rehabilitation for Health Related Services, Inc. (*Id.*). She is Certified as a Rehabilitation Counselor, Vocational Evaluator, OWCP Rehabilitation Counselor, Case Manager, and Vocational Expert. (R. at 123). She is also a Licensed Professional Counselor. (R. at 124).

comfortable driving since her neck surgery. (R. at 41–42). Prior to the surgery, Plaintiff drove regularly. (R. at 42).

Regarding employment, Plaintiff described having difficulty with previous work in a supermarket, because it was too physically demanding. (R. at 44). She reported that the work was also mentally stressful, and that together with her psychiatrist, she decided that she needed to take time off work. (*Id.*). When the ALJ asked whether Plaintiff is currently looking for work, Plaintiff testified that she "would love to" but does not think she can work at this time. (*Id.*).

With respect to her physical impairments, Plaintiff testified that her recent neck fusion limited her ability to rotate her neck, and particularly her ability to look up or down. (R. at 45). Plaintiff also testified that her left side of her body was physically weaker than her right. (R. at 46). She explained that her neck surgery had been performed recently, and that the doctors advised it was too early to know the longer term prognosis. (*Id.*). Yet, Plaintiff said that she may have long-term problems rotating her neck. (*Id.*). She also said that she was waiting to start physical therapy. (*Id.*). The surgery had alleviated some of the pain, numbness, and tingling that Plaintiff had been experiencing. (R. at 46–47). She similarly testified that her previous surgery— on her back—had alleviated her back pain, making it manageable. (R. at 47). Plaintiff described having ongoing pain related to arthritis in her hands, feet, and knees. (*Id.*). She said that she takes medicine only for neck pain, and sometimes gets cortisone injections, which relieve the pain for six months. (*Id.*). Plaintiff testified that her diabetes was stable. (R. at 48).

Plaintiff testified that she uses a nebulizer[69] in the summer time, and always carries an inhaler and an Epi-pen.[70] (R. at 52–53). The ALJ determined that Plaintiff is unable to work in proximity to temperature extremes, excessive levels of wetness or humidity and concentrated exposure to airborne irritants such as fumes, odors, dusts, and gases, and she must be in a well-ventilated environment; the ALJ concluded that the medical records do not support a more restrictive environment. (R. at 22).

When the ALJ inquired into how her physical impairments would affect her ability to work, Plaintiff averred that she would have problems sitting for long periods of time because she gets leg swelling and pain. (*Id.*). Plaintiff agreed that she would like to work in a situation where she would be able to stand up when needed. (*Id.*). Plaintiff said that arthritis in her hands sometimes limits her ability to grip, and that her dexterity has worsened. (R. at 49). She had stopped taking arthritis medication because of her neck surgery, but would resume the medicine soon. (*Id.*). Plaintiff said that this medication helps with her arthritis. (*Id.*). She also said that doctors have told her not to lift more than five pounds because of her recent surgery, but that before the surgery she could lift up to thirty-five pounds. (R. at 51).

With respect to Plaintiff's mental impairments, Plaintiff testified that she left her longest-held job because of stress. (R. at 43). She described her troubles with short-term memory, and that she had been learning methods to cope with same. (R. at 53). However, her memory

---

[69] A nebulizer changes liquid medicine into small droplets inhaled through a mouthpiece or mask. Nebulizers can be used to deliver medicines such as albuterol, and instead of an inhaler. *Treatments and Procedures: Home Nebulizer Therapy*, CLEVELAND CLINIC, *available at* http://my.clevelandclinic.org/services/home_nebulizer/hic_home_nebulizer_therapy.aspx (last visited Oct. 11, 2013).

[70] EpiPen® (epinephrine) 0.3 mg Auto-Injector is for the emergency treatment of life-threatening allergic reactions (anaphylaxis) caused by allergens, exercise, or unknown triggers; and for people who are at increased risk for these reactions. *About EpiPen Auto-Injector*, *available at* http://www.epipen.com/About-EpiPen (last visited Oct. 11, 2013).

problems affected daily functioning, in that she forgets to do tasks and sometimes loses things. (R. at 54). When the ALJ asked about her anxiety problems, Plaintiff averred that her anxiety remains a problem, although that she is generally stable on medication, unless stressful situations arise. (R. at 55).Plaintiff claimed that she was undergoing therapy at the Charte Center about once a week, and was also being seen by a psychiatrist at the Staunton Clinic. (R. at 51, 52). She believed her treatment is to help her manage her bipolar disorder and anxiety disorder, as well as "dealing with some childhood issues." (R. at 55). As to her anxiety, Plaintiff's medications generally help her unless something unusual happens. (*Id.*). She clarified that her anxiety is heightened when "stress situations" occur that "just pop up," such as being in the car with a driver who suddenly swerves. (*Id.*). Plaintiff told the ALJ that her anxiety would affect her similarly during work activities. (R. at 55, 56). Her short term memory problems affect her daily functioning because she often forgets where she puts things, and won't remember certain days if "nothing spectacular happened," and she needs to write down her appointments. (R. at 54). Plaintiff's bipolar disorder causes her "ups and downs," but has been better than what it used to be. (R. at 56). However, she testified that her disorders affect her ability to work because they create inconsistencies and cause her to not finish certain tasks. (R. at 57).

In relation to how her mental health might impact her ability to work, Plaintiff testified that her psychiatrist and therapist have told her they do not think she is ready to work. (R. at 56). Specifically, she testified that she believes her bipolar disorder could interfere with working because "[i]t creates an inconsistency in [her] ability to do things." (R. at 57). She explained that when she enters a manic phase, she has difficulty finishing entire tasks, rather than stopping half-way through. (*Id.*). When she enters a depressive phase, she has trouble focusing on things other than her depression. (*Id.*). However, Plaintiff testified that her medication "helps a lot" with

controlling the symptoms of her bipolar disorder. (*Id.*). Plaintiff testified that her anxiety symptoms may interfere with her working because they cause increasing self-doubt, affecting her ability to perform her job. (R. at 58).

As to her outside activities, interests, and hobbies, Plaintiff testified that she is able to perform basic chores like cleaning the kitchen, and that she bathes regularly. (R. at 59). She was currently getting most of her meals through her housing program, but also visited friends for dinner about twice each week. (*Id.*). Plaintiff described her living situation and social activities.[71] She testified that her quality of life has declined, largely because of her anxiety symptoms. (R. at 64). She opined that anxiety is the biggest barrier she sees to returning to work. (*Id.*).

Next, the ALJ asked the VE to review Plaintiff's work history. (R. at 66). The VE testified that—

- Plaintiff's prior job as a cashier is classified as light and semi-skilled. (*Id.*).

- Her job as an assistant manager for a store would be light and skilled. (*Id.*).

- Her job as a convenience store clerk was light and semi-skilled. (*Id.*).

- Her job as a produce worker in a supermarket was medium and unskilled. (*Id.*).

- Her job as a warehouse worker was light and unskilled. (*Id.*).

- Her job as a display worker was medium and skilled. (*Id.*).

Subsequently, the ALJ posed a number of hypothetical questions to the VE. First, the ALJ asked the VE to assume an individual of Plaintiff's age, education, same work history; who is limited to light work and needs to alternate between sitting and standing as needed; whose job requires no more than occasional pushing, pulling, climbing, balancing, stooping, kneeling,

---

[71] *See* Part III.A., *supra*

crouching, or crawling; whose job environment does not involve work near extreme temperatures, excessive wetness or humidity, concentrated exposure to airborne irritants; who cannot work near occupational hazards or in jobs involving contact with the public; who needs a very low stress job that requires no complex decision making, no high volume productivity requirements, and very infrequent unexpected changes in the workplace; who is limited to jobs involving no more than occasional superficial interaction with co-workers or supervisors; and whose work requires no more than simple, routine, repetitive tasks. (R. at 66–67). The VE testified that this individual would not be able to perform any of Plaintiff's past jobs because of the sitting and standing limitation. (R. at 67). On the other hand, the VE testified that this individual would be able to perform other jobs, such as a packer, at a light exertional level, and that there are approximately one hundred thousand jobs that would fit that description. (*Id.*). Additionally, the individual could work as a sorter, at the light level, and that there are approximately forty thousand jobs nationally. (R. at 68). Finally, the individual could work as a mail clerk, at the light level, and there are approximately sixty-five thousand such jobs nationally. (*Id.*).

The ALJ next asked about this same hypothetical individual, except with the added limitation that the individual could not deal with work-related stress, and would have repeated episodes of going off task or missing attendance. (*Id.*). The VE responded that there would not be any jobs that this individual could perform. (*Id.*).

As a third variation on the above hypothetical person, the ALJ added a limitation that the person could not maintain concentration, and would be off-task fifteen to twenty percent of his or her time at work. (*Id.*).The VE testified that there would not be any jobs that this individual could perform. (*Id.*).

## IV.    STANDARD OF REVIEW

To be eligible for disability benefits under the Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment, which has lasted or can be expected to last for a continuous period of at least twelve months, or which can be expected to result in death. 42 U.S.C. § 423(d)(1)(A); *Cunningham v. Comm'r Soc. Sec.*, 507 F. App'x 111, 114 (3d Cir. 2012). To determine whether a claimant has met the requirements for disability, the Commissioner must utilize a five-step sequential analysis in reviewing the claim. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x. 1; (4) whether the claimant's impairments prevent her from performing past relevant work; and (5) if the claimant is incapable of performing her past relevant work, whether she can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a) (4); *see Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003) (applying the five steps). If the claimant is determined to be unable to resume past relevant work, the burden shifts to the Commissioner at Step Five to prove that, given the claimant's mental or physical limitations, age, education, and work experience, she is able to perform substantial gainful activity in jobs available in the national economy. *Breslin v. Comm'r Soc. Sec.*, 509 F. App'x 149, 152 (3d Cir. 2013).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute and is plenary as to all legal issues. 42 U.S.C. §§ 405(g), 1383(c)(3); *Hagans v. Comm'r*

*Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2013) (citing *Schaudeck v. Comm'r Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999)). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Hagans*, 694 F.3d at 292. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Perez v. Comm'r Soc. Sec.*, 521 F. App'x 51, 53–54 (3d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.

When considering a case, a district court cannot conduct a de novo review, nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered.[72] *Palmer v. Apfel*, 995 F.

---

[72]     Accordingly, this Court is limited in what Exhibits to consider. The voluminous Record that was submitted to this Court includes multiple pieces of evidence that were submitted *after* the ALJ issued his decision. The Social Security Act authorizes judicial review only over a "final decision" of the Commissioner. *Califano v. Sanders*, 430 U.S. 99, 108 (1977); *Bacon v. Sullivan*, 969 F.2d 1517, 1519–21 (3d Cir. 1992). A federal court has no jurisdiction to entertain a challenge to a decision by the Appeals Council denying a claimant's request for review. *Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). When the Appeals Council denies a request for review, the ALJ's decision becomes the "final decision" of the Commissioner. *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000). In determining whether that decision is "supported by substantial evidence," a reviewing court can consider only the evidence that was available to the ALJ at the time of his or her decision. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 360 (3d Cir. 2011).
        In this case, Exhibits 1A through 19F were admitted at the hearing. (R. at 39). The ALJ left the record open for two additional weeks. Exhibits 20F–25F were apparently submitted after the hearing but before the issuance of the ALJ's decision. Those exhibits cover pages 418–530 of the record. The Appeals Council Exhibits list indicates that Exhibits 12E and 26F–36F were submitted to the Appeals Council in support of the claimant's request for review. (R. at 5–8). They became a part of the administrative record on February 25, 2013, which was *after* the ALJ's decision. Those exhibits cover pages 217 and 531–666 of the record. In determining whether the ALJ's decision is supported by substantial evidence, the Court can consider Exhibits 1A–25F (which includes the exhibits submitted after the hearing but before the ALJ's decision). The Court cannot consider Exhibits 12E and 26F–36F, because they were not a part of the record before the ALJ.
        The Court further notes that Exhibits 12E and 26F–36F could be considered only for the purpose of determining whether the claimant is entitled to a "new and material evidence" remand under the sixth sentence of 42

Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196–97. Further, "even where this court acting de novo might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1191 (3d Cir. 1986).

## VI.   DISCUSSION

In his September 21, 2011 decision, the ALJ concluded that Plaintiff had not been under a disability within the meaning of the Act from the alleged disability onset date of May 31, 2009 through the date of his decision. (R. at 28). The ALJ found that Plaintiff satisfied Step One because she had not engaged in substantial gainful activity since the alleged onset date. (20 C.F.R. §§ 404.1520(c), 416.920(c)). (R. at 18). At Step Two, he found that Plaintiff had severe impairments including cervical disc herniation (status post-surgery), chronic low back pain, asthma, attention deficit hyperactivity disorder, bipolar disorder, and anxiety disorder. (20 C.F.R. §§ 404.1520(c), 416.920(c)). (R. at 18). These impairments did not meet one of the listings under the Act, either individually or in combination, and so the analysis proceeded beyond Step Three. (R. at 18).

For the remaining steps, and after considering evidence from the Record, the ALJ found that Plaintiff has the RFC to perform light work, with the following limitations:

- Ability to alternate between sitting and standing as needed;

---

U.S.C. Section 405(g). However, the Plaintiff does not move for a sentence-six remand, and as a consequence, those exhibits cannot be considered for any purpose. *Chandler*, 667 F.3d at 360.

- No more than occasional pushing, pulling, climbing, balancing, stooping kneeling, crouching and crawling;

- Must be in a well-ventilated area—no work in proximity to temperature extremes, excessive levels of wetness or humidity, concentrated exposure to airborne irritants such as fumes, odors, dusts and gases;

- No proximity to occupational hazards such as unprotected heights, dangerous machinery, ropes, ladders, and scaffolds;

- No contact with the public;

- Low stress work, which the ALJ defined as no complex decision-making, no high volume productivity requirements, and very infrequent unexpected changes in the workplace;

- No more than occasional superficial interaction with co-workers or supervisors;

- No more than simple, routine, repetitive tasks.

(R. at 20–21). In light of these restrictions, the ALJ found that Plaintiff is unable to perform any past relevant work. (R. at 27). However, considering the Plaintiff's age, education, work experience, the RFC, and the VE's testimony, the ALJ concluded there are a significant number of jobs existing in the national economy wherein Plaintiff is able to work, despite her limitations. (*Id.*).

Plaintiff argues that the Commissioner's decision to deny disability benefits is not supported by substantial evidence and consequently should be remanded. (Docket No. 10, at 9). She appeals to this Court under 42 U.S.C. § 405(g), raising two arguments: (1) the VE's testimony in response to the ALJ's hypothetical RFC conflicts with the Dictionary of Occupational Titles; and (2) the ALJ erred by neglecting to include a reaching limitation in his RFC, which logically should have been included in light of his findings at Step Two. (Docket

No. 10, at 5, 7). In her cross-motion for Summary Judgment, Commissioner contends that the ALJ's findings in the RFC and his determination that Plaintiff is not disabled are both supported by substantial evidence. (Docket No. 12, at 11, 13). The Court now considers each of Plaintiff's arguments, in turn.

### A. Conflict Between VE Testimony / RFC Findings and Dictionary of Occupational Titles

Plaintiff first focuses on the ALJ's findings at Step Five, arguing that the jobs the VE provided in response to the ALJ's hypothetical RFC findings—packer, sorter, and mail clerk—are incompatible with the RFC findings under the Dictionary of Occupational Titles[73] (DOT). (Docket No. 10, at 5–6). The VE did not provide the DOT numbers for the three jobs during her testimony. (R. at 67–68). In her brief, Plaintiff supplies possible DOT numbers for each job, and then sets forth that the exertional information listed in the DOT is inconsistent with the ALJ's hypothetical RFC. (Docket No. 10, at 5–6). Pointing to *Boone v. Barnhart*, 353 F.3d 203, 208 (3d Cir. 2003), Plaintiff contends that the conflict between the VE's testimony and the DOT require remand in that the ALJ failed to meet his burden at Step Five. (Docket No. 10, at 5–7). She reasons that "it is not a minor inconsistency where nearly every job cited by the vocational expert was beyond the capacity of the ALJ's hypothetical RFC when actually looking at how the jobs are defined in the DOT." (*Id.*).

This Court finds that remand is not required based on the alleged conflict. As with all social security cases, assuming a claimant meets his or her burden at Steps One through Four,

---

[73]    In addition to advisory testimony from a VE, at the fourth and fifth steps the ALJ will generally consult the *Dictionary of Occupational Titles* (DOT), a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy, in order to determine whether any jobs exist that a claimant can perform. 20 C.F.R. § 416.966(d); *Burns v. Barnhart*, 312 F. 3d 113, 119 (3d Cir. 2002). The DOT can be accessed online at http://www.oalj.dol.gov/libdot.htm.

Step Five places a burden upon the Commissioner to prove that a particular claimant is able to perform substantial gainful activity in jobs available in the national economy. *Doak v.Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). Plaintiff is correct in that the Commissioner's regulations take administrative notice of the information contained in the DOT. 20 C.F.R. § 416.966(d); *Burns v. Barnhart*, 312 F. 3d 113, 119 (3d Cir. 2002). However, Plaintiff's argument fails because a VE's testimony need not be based *solely* on the DOT's job descriptions. *Conn v. Astrue*, 852 F. Supp. 2d 517, 528–29 (D. Del. 2012). Formal job descriptions do not always mirror the duties that employees are expected to perform and the conditions in which they are required to work. *Garcetti v. Ceballos*, 547 U.S. 410, 424–25 (2006). The primary function of vocational expert testimony is to supplement generic job descriptions with information about what employers in the national economy actually expect of their employees on a day-to-day basis. A vocational expert may testify based on her education, training, and experience. *Conn*, 852 F. Supp. 2d at 528–29. Such testimony cannot be impugned merely because it accounts for information existing apart from the job descriptions found in the DOT.

Plaintiff avers that the jobs suggested by the VE conflict with the ALJ's finding of her ability to do work at the light, unskilled level. (Docket No. 10, at 5). However, as Commissioner points out, the same job titles appear in the DOT at different exertional levels depending on the precise industry involved. (Docket No. 12, at 14–15).[74] At the hearing, the VE specifically

---

[74]     First, with respect to a "packer" (R. at 67), Plaintiff supplies a DOT number of 920.587-018, which requires medium exertional work. (Docket No. 10, at 5). (DOT 920.587-018, 1991 WL 687916). But Commissioner points out that "the DOT lists 106 packer jobs in many different industries at all exertional levels depending upon the weight of the items packed." (Docket No. 12, at 14). For example, packer jobs include cotton roll packer (DOT 920.685-054, 1991 WL 687936) and bottle packer (DOT 920.685-026, 1991 WL 687929). Both of these jobs require light exertion.
          Second, with respect to a "sorter" (R. at 68), Plaintiff supplies a DOT number of 209.687-022, which is a semi-skilled job, inconsistent with the RFC finding of unskilled work. (Docket No. 10, at 5). (DOT 209.687-022,

testified that the jobs to which she was referring existed "at the light exertional level." (R. at 67–68). Thus, it is clear from the Record that the VE was accounting for Plaintiff's exertional limitations. *Id.* Plaintiff cannot evade the import of that testimony by pointing to DOT job descriptions referring to positions at high exertional levels, and speculating that, because the precise numerical classifications were not identified at the hearing, the VE *might* have been mistaken. As such, this Court finds that remand is not required.

### B.    RFC Findings

Plaintiff's second argument attacks the ALJ's RFC findings, in that the ALJ did not include a limitation relating to reaching or range of motion. (Docket No. 10, at 7–8). To this end, Plaintiff points to the ALJ's determination at Step Two that Plaintiff has multiple severe medical impairments, including degenerative disc disease and spinal stenosis of the cervical spine (status-post surgery) with evidence that this causes arm weakness. (*Id.* at 8). Plaintiff argues that it "seems logical" that with these conditions, an RFC would include "some limitation in terms of reaching overhead, reaching forward or laterally, limited range of motion of the neck, and possibly other manipulative limitations, such as with handling or dexterity." (*Id.*). Further, Plaintiff notes that an additional limitation with respect to reaching might change the ultimate outcome, in that her RFC could potentially become sedentary. (*Id.*) Considering her age category

---

1991 WL 671812). Commissioner asserts that the DOT lists 139 sorter positions, many of which require unskilled work. (Docket No. 12, at 14–17). *See, e.g.,* Garment Sorter (DOT 222.687-014, 1991 WL 672131).

Finally, with respect to a "mail clerk" position (R. at 68), Plaintiff offers two potential DOT numbers: 209.587-018 (a semi-skilled job), and 209.687-026 (an unskilled job). (Docket No. 10, at 5). Plaintiff claims that although one of the jobs is unskilled, "it is impossible to tell from the record which DOT [number] the VE was relying upon," and even if the VE meant the unskilled mail clerk, "it is impossible to decipher the number of jobs in existence as a mail clerk that are unskilled versus semi-skilled without additional evidence." (Docket No. 10, at 6). Commissioner notes, however, that Plaintiff's argument fails on its face, as one of the DOT jobs identified is "unskilled," and therefore consistent with the VE's testimony. (Docket No. 12, at 15). The Court agrees.

of 50–54[75] and vocational profile, if she is limited to sedentary work, Plaintiff argues, "it could

be a potentially outcome-determinative point." (*Id.*).

Commissioner argues that the RFC is supported by substantial evidence, and that remand

is not required. (Docket No. 12, at 11–13). Commissioner contends that the ALJ sufficiently

addressed Plaintiff's back and neck impairments by restricting her to light work that required

lifting no more than ten pounds on a regular basis with only occasional postural activities and no

climbing, as well as providing her with a sit/stand option whenever she needed to change

positions due to her lower back pain complaints. (*Id.* at 11). These findings, Commissioner

argues, are supported by the medical records detailing Plaintiff's physical limitations from her

treating orthopedic physician, Dr. Thomas; the consultative examination by Dr. Christo; surgical

records from Plaintiff's procedure by Dr. Lee; and examination notes from Dr. Anand. (*Id.* at

11–12). Commissioner also discusses psychological treatment and evaluations from Drs. Christo,

Getz, Shymansky, and Sinu, which support finding no limitation on Plaintiff's ability to reach.

(*Id.*). Further, Commissioner claims that there is no support for the opinion of Plaintiff's social

worker/therapist, Callie Cooper. (*Id.* at 13). Her opinion that Plaintiff was severely limited is

inconsistent with Dr. Shymansky's and Dr. Getz's neurological tests, as well as Dr. Christo's

observation that Plaintiff "was able to follow directions as he gave them, and able to add simple

---

[75] Plaintiff argues this point applying the "Person Closely Approaching Advanced Age" category, instead of the "Younger Person" category applied by the ALJ in his decision. 20 C.F.R. § 404.1562(c), (d). Because Plaintiff turned fifty between the alleged onset date and the date of the ALJ's decision, Plaintiff is correct that the latter category should have been considered. Nonetheless, the ALJ's failure to recognize Plaintiff's transition from a "younger person" to a "person closely approaching advanced age" had no effect on the decision. The ALJ used Medical-Vocational Rule 202.21 as a framework for decision-making, which was appropriate for the period of time in which Plaintiff was under the age of fifty. If the ALJ had properly recognized the change in age categories, the proper rule would have been Medical-Vocational Rule 202.14. 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 2. Rules 202.21 and 202.14 would both direct a finding of "Not Disabled." Further, the rules were not directly applied, because Plaintiff had nonexertional limitations. Therefore, the ALJ's mistake relating to the change in age categories was inconsequential.

41

and complex numbers without difficulty." (*Id.*). Because there was no support for Ms. Cooper's opinion, and because a social worker is not an acceptable medical source under the regulations,[76] Commissioner concluded "her opinion is not entitled to controlling weight." (*Id.*).

When applying for SSA benefits, a claimant bears the burden of producing evidence about his or her medical condition. *Bowen v. Yuckert*, 482 U.S. 137, 137 n.5 (1987). Once evidence such as medical records have been provided by the claimant, if the record contains objective evidence of an impairment that could reasonably be expected to cause pain, the ALJ must give "serious consideration" to a claimant's subjective complaints of pain. *Mason v. Shalala*, 994 F.2d 1058, 1067–68 (3d Cir. 2005). If the claimant does not provide medical records that establish an impairment that significantly limits the claimant's ability to do basic work activities, the ALJ can assume a claimant has no limitations until it is proven that one exists. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).

In light of this authority, and upon review of the Record, this Court finds that the ALJ adequately met his responsibilities under the law. The ALJ accommodated Plaintiff's complaints of pain in her back and neck by restricting her to light work requiring lifting no more than ten pounds on a regular basis, with only occasional postural activities, and no climbing. (R. at 20–21).

Plaintiff's claim that an additional limitation was required based on "logic" (Docket No. 10, at 8), lacks merit because the Record contains substantial evidence to support the ALJ's decision that no further limitation was needed. The ALJ found that the preponderance of the evidence supported his RFC. (R. at 22). In June 2009, Dr. Thomas reviewed Plaintiff's MRI

---

[76]      Commissioner refers to 20 C.F.R. §§ 404.1513, 404.1527(d), and 416.913 to support this argument.

following her automobile accident and determined that she could return to work. (R. at 250). In March 2010, Dr. Christo's examination showed Plaintiff's neck had good range of motion, and that her upper extremities had full range of motion at the shoulders, elbows, and wrists. (R. at 331, 335). This examination showed no limitation on reaching. (*Id.*). Additionally, after Dr. Lee performed decompression of Plaintiff's cervical nerve roots on April 11, 2011, Plaintiff stated she no longer had any weakness or radicular symptoms, and Dr. Lee advised her not to lift more than 10 to 15 pounds at a time. (R. at 465). The ALJ accommodated this restriction by including functional limitations that limited Plaintiff to light work, with a sit/stand option, limitations for pushing and pulling, occasional postural maneuvers, and no occupational hazards. (R. at 24). Finally six months after the surgery, x-rays of Plaintiff's cervical spine showed "the fusion looks pretty solid," and she had good range of motion. (Docket No. 12, at 12; R. at 635).

The ALJ included postural and lifting restrictions in his RFC that sufficiently accommodate Plaintiff's alleged complaints, and are supported by the medical evidence she provided. Additionally, the ALJ included all of said limitations in his hypothetical question posed to the VE at the hearing. In sum, the Court finds that the ALJ's determinations with respect to any limitations caused by Plaintiff's cervical disc herniation and/or degenerative disc disease were supported by substantial evidence. (R. at 22–26). As such, remand in this case is not warranted.

## VII.    CONCLUSION

Based upon the abovementioned, this Court finds the decision of the ALJ is supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment is DENIED; Defendant's

Motion for Summary Judgment is GRANTED; and, the decision of the ALJ is AFFIRMED.

Appropriate Orders follow.


_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

cc/ecf: All counsel of record